BioE LLC,

                    Plaintiff,


v.                                          **MEMORANDUM OF LAW & ORDER**
                                            Civil File No. 10-2085 (MJD/FLN)


MEDIATECH, INC. and
JAMES DeOLDEN, President
of Mediatech, Inc.,

                    Defendants.

Rikke Dierssen-Morice and Leif T. Simonson, Faegre & Benson LLP, Counsel for Plaintiff.

Michael D. Hutchens, Jeffrey M. Thompson, Frank M. Modich, and John E. Radmer, Meagher & Geer, P.L.L.P., Counsel for Defendants.


## I.      INTRODUCTION

This matter is before the Court on Defendants' Amended Motion to

Dismiss.  [Docket No. 16]  The Court heard oral argument on December 8, 2010.

The Court grants in part and denies in part Defendants' motion.

## II.      FACTUAL BACKGROUND

According to the Amended Complaint:

**A.      Parties**

Plaintiff BioE LLC ("BioE") is a Minnesota limited liability company with its principal place of business in Minnesota.  BioE is a biomedical company in the business of commercializing human umbilical cord blood stem cells and associated tools and techniques for therapeutic and pharmaceutical use.  Its principal product is a cord blood processing system that comprises three bags and connecting tubing (the "Product").

Defendant Mediatech, Inc. ("Mediatech") is a Virginia corporation with its principal place of business in Virginia.  Mediatech manufactures products for the medical, pharmaceutical, and biotech industries.

Defendant James DeOlden is the President and founder of Mediatech and a resident of Virginia.

**B.      Formation of Parties' Relationship**

In fall 2004, BioE had not yet determined how it would manufacture two of the Product's three bags, the connecting tubing, or various clamps and ports attached to the bags, fill the bags with reagent, or assemble the Product prior to

shipment to customers. BioE contacted Mediatech in October 2004. During the 2004 and 2005 discussions between BioE and Mediatech, Mediatech made various allegedly false representations regarding its ability to manufacture the Product for BioE.

On August 30, 2005, BioE and Mediatech entered into a Supply Agreement (the "Agreement"). The Agreement provided that Mediatech would manufacture, sell, and deliver products to BioE in compliance with BioE's specifications, which had yet to be determined. The Agreement contemplated that Mediatech and BioE would establish the Product's specifications as it was being developed. BioE and Mediatech began producing prototypes in late 2005.

BioE considered visual inspection for particulate matter to be highly important. By mid-2006, the parties incorporated into the Agreement a requirement that the Product should be 100% free of visual particles and that Mediatech would visually inspect each bag set it produced and reject any that contained visible particles.

### C. Mediatech's Production and Inspection of Product Bag Sets

During BioE's clinical trials, which commenced in August 2006, Mediatech produced multiple lots of bag sets that contained visible white particles or black particulate matter. Mediatech notified BioE of the problem with these lots. Mediatech investigated and determined that the white particles were denatured protein particles created inside the bags when its filling machinery got too hot. To remedy the problem, Mediatech changed its processes and protocols to allow the filling machine to cool between bags.

On multiple occasions, DeOlden represented that the change to Mediatech's process solved the white particle problem. The white particle problem continued, and Mediatech eventually installed a cooling system on the filling machine.

In November 2007, after Mediatech represented to BioE that it had resolved all issues, BioE submitted its application for Food and Drug Administration ("FDA") clearance for the Product. In December 2007, Mediatech delivered a lot of filled bags for BioE to sell to a customer. In January 2008, before BioE delivered the bag sets to the customer, Mediatech

informed BioE that the lot contained non-sterilized bag sets. This rendered the entire lot unusable and caused BioE to delay its shipment to the customer.

In December 2008, BioE received its 510(k) clearance. In February 2009, Mediatech delivered to BioE bag sets from two new lots that it had produced. BioE discovered that the bags were contaminated with particles visible from several feet away and notified Mediatech of this problem. Mediatech re-inspected all bags from one of the lots and delivered the lot to BioE with the certification that it was free of visible particles. BioE inspected this lot and found that 50–70% of the bags did contain visible particles. BioE was unable to sell the lot, and, also, had to warn customers that some contaminated bags had been mixed into another set, which had been sent to customers and had reached end-users.

During this time, DeOlden and other Mediatech representatives maintained that the particles were not caused by Mediatech's processes. In March 2009, DeOlden drafted and sent a written report to BioE and ASI, a supplier, which laid out the steps Mediatech had taken to identify the source of the contamination and concluded that Mediatech had not caused the

contamination.  DeOlden made the same claim during several telephone conversations with BioE.

Mediatech later determined that a component part of the bag sets it was purchasing from a supplier in China and providing to the subcontractor were contaminated.  In September 2009, Mediatech determined that another likely source of the particle contamination was an S-shaped pipe on its filling equipment that it had not inspected or cleaned.

As part of the joint effort to identify the source of the particle contamination, ASI, Mediatech, and BioE all inspected validation lots of bag sets.  ASI identified visible particles in 55% of the sets; Mediatech identified visible particles in only 0.5% of the same sets.  BioE examined only a portion of the bag sets in these validation lots and identified contamination in 23%.  From October 2009 through December 2009, Mediatech continued producing and delivering bag sets to BioE, of which BioE rejected approximately 5–15% due to contamination.  Finally, on December 16, 2009, BioE received two letters from Mediatech indicating that the Mediatech employee inspecting the validation

lots and returned Products had bad eyesight and could not see particles that others could see.

### D. Procedural Background

On May 18, 2010, BioE filed a Complaint against Mediatech and DeOlden in this Court. On July 23, 2010, BioE filed an Amended Complaint against Mediatech and DeOlden, which alleges: Count I: Negligence (Mediatech); Count II: Breach of Contract (Mediatech); Count III: Misrepresentation (Mediatech and DeOlden); and Count IV: Negligent Retention and Supervision (Mediatech and DeOlden).

Defendants now move that all claims against DeOlden must be dismissed because this Court lacks personal jurisdiction over him; that the negligent misrepresentation claims against DeOlden and Mediatech be dismissed for failure to plead with particularity and failure to state a claim upon which relief can be granted; and that the negligent retention and supervision claims against DeOlden be dismissed for failure to state a claim upon which relief can be granted.

## III. DISCUSSION

**A.      Personal Jurisdiction**

      **1.      Personal Jurisdiction Standard**

While the plaintiff eventually bears the burden to establish personal jurisdiction by preponderance of the evidence, when personal jurisdiction is decided based upon affidavits, prior to an evidentiary hearing, the plaintiff need only establish a prima facie showing of personal jurisdiction.  Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). "[T]he court must look at the facts in the light most favorable to the nonmoving party, and resolve all factual conflicts in favor of that party."  Id. (citations omitted).

"A two-step inquiry is employed when determining whether a federal court has jurisdiction over a non-resident party: (1) whether the facts presented satisfy the forum state's long-arm statute, and (2) whether the nonresident has 'minimum contacts' with the forum state, so that the court's exercise of jurisdiction would be fair and in accordance with due process."  Soo Line Railroad Co. v. Hawker Siddeley Canada, Inc., 950 F.2d 526, 528 (8th Cir. 1991) (citation omitted).  The Minnesota long-arm statute extends jurisdiction to the

fullest extent permitted by the due process clause.  <u>Id.</u>  Thus, the Court need

only determine whether the due process clause allows jurisdiction in this case.

The Eighth Circuit has explained:

> The due process clause requires there be minimum contacts
> between the defendant and the forum state before the forum state
> may exercise jurisdiction over the defendant.  Sufficient contacts
> exist when the defendant's conduct and connection with the forum
> State are such that he should reasonably anticipate being haled into
> court there, and when maintenance of the suit does not offend
> traditional notions of fair play and substantial justice.  In assessing
> the defendant's reasonable anticipation, there must be some act by
> which the defendant purposefully avails itself of the privilege of
> conducting activities within the forum State, thus invoking the
> benefits and protections of its laws.

<u>Id.</u> at 528-29 (citations omitted).

In order to determine whether the exercise of jurisdiction comports with

due process, the Court examines five factors:

> (1) the nature and quality of the contacts with the forum state; (2)
> the quantity of contacts with the forum; (3) the relation of the cause
> of action to these contacts; (4) the interest of the forum state in
> providing a forum for its residents; and (5) the convenience of the
> parties.

<u>Stanton v. St. Jude Med., Inc.</u>, 340 F.3d 690, 694 (8th Cir. 2003) (citation

omitted).

In <u>Calder v. Jones</u>, 465 U.S. 783 (1984), the Supreme Court "approved an 'effects' test that allows the assertion of personal jurisdiction over non-resident defendants whose acts 'are performed for the very purpose of having their consequences felt in the forum state.'" <u>Dakota Indus., Inc.</u>, 946 F.2d at 1390–91 (citations omitted). <u>Calder</u>'s effects test does not replace the traditional five-factor test; rather, it "requires the consideration of additional factors when an intentional tort is alleged." <u>Dakota Indus.</u>, 946 F.2d at 1391 (citation omitted).

A court can exercise either specific or general personal jurisdiction over a party. "Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within the forum state, while [g]eneral jurisdiction . . . refers to the power of a state to adjudicate any cause of action involving a particular defendant, regardless of where the cause of action arose." <u>Coen v. Coen</u>, 509 F.3d 900, 905 (8th Cir. 2007) (citation omitted). General personal jurisdiction exists when a party has "continuous and systematic" contacts with the forum state. <u>Id.</u> In the instant case, neither party argues that DeOlden is subject to general jurisdiction in Minnesota. Thus, the only

jurisdictional issue before the Court is whether it may exercise specific personal jurisdiction over DeOlden.

## 2.    The Nature, Quality, and Quantity of the Contacts

DeOlden argues that he is not subject to personal jurisdiction in Minnesota because only his contacts, not Mediatech's, may be considered, and he has visited the state only once, 10–12 years ago, on a trip unrelated to the present litigation. He owns no property or real estate in Minnesota, and has no possessions here.

He further argues that although he is the president of Mediatech, he was not a signatory to any contract between Mediatech and BioE. According to DeOlden, he did not make personal representations to BioE on behalf of Mediatech, was merely a peripheral participant in conference calls between the companies' employees, and his only direct contacts with BioE were telephone calls related to BioE's threats of litigation.

To the extent that DeOlden is arguing that he is insulated because his only contacts with Minnesota were in his official capacity, the United States Supreme Court has explicitly "reject[ed] the suggestion that employees who act

in their official capacity are somehow shielded from suit in their individual capacity" as a matter of due process. <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 781 n.13 (1984). Minnesota "has thus far neither expressly adopted nor expressly rejected the [fiduciary shield] doctrine." <u>Oakridge Holdings, Inc. v. Brukman</u>, 528 N.W.2d 274, 278 (Minn. Ct. App. 1995). Nevertheless, Minnesota's long-arm statute extends to the full extent permissible under constitutional due process, and "[t]he Minnesota Supreme Court has given no indication that it is inclined to [adopt the fiduciary shield doctrine]." <u>M.G. Incentives, Inc. v. Marchand</u>, No. C6-00-962, 2001 WL 96223, at *5 (Minn. Ct. App. Feb. 6, 2001) (unpublished). The Court declines to adopt the fiduciary shield doctrine here, particularly when the claims against DeOlden are based in fraud. <u>See, e.g.</u>, <u>Safco Prods. Co. v. WelCom Prods., Inc.</u>, --- F. Supp. 2d ----, 2010 WL 3034158, at *7 (D. Minn. Aug. 3, 2010) (declining to apply the doctrine in Minnesota).

At this stage, taking the facts in the light most favorable to BioE, DeOlden played an active role in the companies' relationship and in Mediatech's manufacture of the specific product at issue here. He knew BioE was located in

Minnesota. He actively participated in more than 20 teleconferences with BioE

representatives in 2006, 2007, and the first half of 2009. He met with BioE

representatives when they visited Virginia on three occasions. He also drafted

and sent to BioE a report detailing Mediatech's conclusions regarding the

source of the contamination in the bags. On several occasions, he falsely

represented to BioE that Mediatech had solved the particulate problem. These

are ample contacts, aimed at BioE, in Minnesota, that weigh in favor of personal

jurisdiction.

### 3.     The Relation of the Cause of Action to the Contacts

To satisfy specific jurisdiction, there must be a connection between the

cause of action and the defendant's contacts with the forum state. In this

instance, DeOlden's communications with BioE represent the bulk of his

contacts with Minnesota, and were the vehicle for the alleged

misrepresentations that form the core of BioE's reckless misrepresentation

claim. This factor weighs in favor of personal jurisdiction.

### 4. The Interest of the Forum State

Minnesota has an interest in providing a forum for its residents to seek redress for alleged fraud against them.  <u>Kopperud v. Agers</u>, 312 N.W.2d 443, 445 (Minn. 1981).  This factor weighs in favor of jurisdiction.

### 5. The Convenience of the Parties

DeOlden argues that the convenience of the parties weighs against jurisdiction because of his physical condition and the distance between Minnesota and his home in Virginia.  He asserts that every seven to ten weeks, he becomes incapacitated with a severe bout of Meniere's Disease that leaves him with episodes of headaches, vomiting, and vertigo.

DeOlden's condition will affect him whether he is in Virginia or Minnesota, and that the parties and Court will accommodate his illness in either case.  DeOlden's health issue is not a compelling reason for this Court to decline jurisdiction.  Moreover, while Virginia would be a more convenient forum for DeOlden, Minnesota is a more convenient forum for BioE and its witnesses.  This factor weighs in favor of jurisdiction.

### 6. The <u>Calder</u> Effects Test

Finally, the outcome of the <u>Calder</u> effects test weighs in favor of jurisdiction because, according to Plaintiff, DeOlden made reckless misrepresentations to BioE, a company he knew was located in and would be injured in Minnesota. <u>See, e.g.</u>, <u>Oriental Trading Co., Inc. v. Firetti</u>, 236 F.3d 938, 943 (8th Cir. 2001) ("By purposely directing their fraudulent communications at [forum residents], the defendants should have realized that the brunt of the harm would be felt there, and they should have reasonably anticipated being haled into court there.") (citation omitted); <u>Finley v. River North Records, Inc.</u>, 148 F.3d 913, 916 (8th Cir. 1998) (finding personal jurisdiction when defendant engaged in "fraudulent conduct, intended to induce commercial activity within the forum state").

### 7. Conclusion

Because all factors weigh in favor of personal jurisdiction over DeOlden, the Court denies DeOlden's motion to dismiss for lack of personal jurisdiction.

### B. Legal Standard for a Motion to Dismiss

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move the Court to dismiss a claim if, on the pleadings, a party has failed to state a claim upon which relief may be granted. In reviewing a motion to dismiss, the Court takes all facts alleged in the complaint to be true. Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Thus, although a complaint need not include detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. (citations omitted).

In deciding a motion to dismiss, the Court considers "the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint." PureChoice, Inc. v. Macke, Civil No. 07-1290, 2007 WL 2023568, at *5 (D. Minn. July 10, 2007) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Circ. 1999)).

## C. Negligent Retention and Supervision

### 1.    Standards

"Negligent supervision is the failure of an employer to exercise ordinary care in supervising the employment relationship so as to prevent foreseeable misconduct of an employee from causing harm to others."  Olson v. First Church of Nazarene, 661 N.W.2d 254, 264–65 (Minn. Ct. App. 2003) (citation omitted).  "In order to establish a negligent supervision claim, a plaintiff must prove that the employee's injurious conduct was foreseeable and that the employer failed to exercise ordinary care when supervising the employee." J.M. v. Hopkins Sch. Dist., No. Civ. 01-2124, 2003 WL 41639, at *12 (D. Minn. Jan. 3, 2003) (citing Oslin v. State, 543 N.W.2d 408, 415 (Minn. Ct. App. 1996)).

> An employer may be liable for negligent retention when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment.

Olson, 661 N.W.2d at 264 (citation omitted).

### 2.    Physical Injury

Under Minnesota law, as explained by this Court in J.M. v. Hopkins School District, "negligent supervision claims require proof of a physical

injury." 2003 WL 41639, at *12 (citing Oslin v. State, 543 N.W.2d 408, 415 (Minn. Ct. App. 1996); Bruchas v. Preventative Care, Inc., 553 N.W.2d 440, 443 (Minn. Ct. App. 1996)).). See also Johnson v. Peterson, 734 N.W.2d 275, 277 (Minn. Ct. App. 2007) ("Economic harm alone is not enough to support negligent-supervision actions.") (citations omitted).

Similarly, actual or threatened physical injury is "[a]n essential element of a negligent retention claim." Walker v. Minn. Mining & Mfg. Co., No. C4-99-1715, 2000 WL 520254, at *5 (Minn. Ct. App. May 2, 2000) (citing Bruchas, 553 N.W.2d at 443). That physical injury or threatened physical injury must be suffered by the plaintiff. See, e.g., McKenzie v. Rider Bennett, LLP, Civil No. 05-1265, 2008 WL 80608, at *5 (D. Minn. Jan. 8, 2008); McKenzie v. Lunds, Inc., 63 F. Supp. 2d 986, 1007 (D. Minn. 1999) ; Webb v. Xcel Energy, Inc., No. A06-562, 2007 WL 1412852, at *4 (Minn. Ct. App. May 15, 2007).

Here, the only harm alleged to BioE is financial. The "potential bodily injury" noted in the Complaint relates to potential injuries to third parties, who, in turn, might assert claims against BioE that, if successful, would cause BioE financial—not physical—harm. When the Court raised this issue during oral

argument, Plaintiff was unable to point to any potential for physical injury to itself.

The Court dismisses Count IV for failure to state a claim because no physical injury or threat of physical injury to Plaintiff is alleged.

## D. Misrepresentation

### 1. Standard

The elements of reckless misrepresentation are:

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.

Zutz v. Case Corp., 422 F.3d 764, 770-71 (8th Cir. 2005) (quoting Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 532 (Minn. 1986)). Opinions and "general and indefinite" statements are not representations of fact. Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 747 (Minn. 2000). Nor is sales puffery. See Sportmart, Inc. v. Hargesheimer, No. CX-97-161, 1997 WL 406386, at *2 (Minn. Ct. App. July 22, 1997) (unpublished).

Minnesota law considers an allegation of misrepresentation, "whether labeled as a claim of fraudulent misrepresentation or negligent misrepresentation [to be] an allegation of fraud which must be pled with particularity," and such a claim is subject to Federal Rule of Civil Procedure 9(b). Trooien v. Mansour, 608 F.3d 1020, 1028 (8th Cir. 2010) (citation omitted). A pleading which alleges fraud must identify the "who, what, when, where, and how." Parnes v. Gateway 2000, Inc., 122 F.3d 539, 550 (8th Cir. 1997). The facts alleged must be sufficient to "give Defendants notice of what conduct is complained of and to prepare a defense to such claim of misconduct." First Presbyterian Church of Mankato, Minn. v. John G. Kinnard & Co., 881 F. Supp. 441, 445 (D. Minn. 1995) (citation omitted). "[A] plaintiff must specifically allege the 'circumstances constituting fraud,' . . . including 'such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.'" Stark v. Monson, Civil No. 07-4373, 2008 WL 189959, at *8 (D. Minn. Jan. 22, 2008) (quoting Abels v. Farmers Commodities Corp., 259 F.3d 910, 920 (8th Cir. 2001)).

### 2. Discussion

#### a) Introduction

The Court agrees with Defendants that BioE's allegations of misrepresentation are not pleaded with sufficient particularity. BioE's complaint leaves Defendants unable to identify and defend against the alleged misrepresentations.

#### b) Alleged Misrepresentations

In its brief, BioE points to eight alleged misrepresentations in its Amended Complaint. Because the timing and context of the statements is relevant to what, if any, reasonable reliance was induced and what, if any, injury was caused, the Court analyzes the alleged misrepresentations in chronological order.

##### i. Vague or Unknown Timing

- Mediatech falsely and recklessly certified its products as being free of visual particulates. (Am. Compl. ¶¶ 4, 47.)

- "Throughout [late 2005], as well as in 2006 and 2007, there were numerous telephone conversations and in-person meetings at Mediatech in which representatives of Mediatech, including DeOlden, Thompson and Chris Cornell, specifically represented that Mediatech had the ability to perform adequate quality control testing, including adequate inspection for particulate matter in the

> bag sets. . . .  BioE reasonably relied upon Mediatech's and
> DeOlden's statements and representations.  [These statements]
> were false and were made recklessly."  (Am. Compl. ¶¶ 23–25.)

The first allegation, which covers two separate paragraphs of the

Amended Complaint, does not identify a time, a place, the identity of the

person making the misrepresentation, nor what was obtained or given up.

The content of the second alleged misrepresentation is adequately

pleaded, but BioE does not identify the time (other than a period spanning

several years), or the place (except an unidentified number of phone

conversations and meetings).  Because the timing is unclear, Defendants cannot

discern whether some of these alleged misrepresentations occurred before the

product specifications were defined and, therefore, are pre-contract statements

of opinion or promises of future performance regarding quality control

standards not yet decided.

BioE alleges reliance generally and also alleges that, after it discovered

that the Product was contaminated, it "reasonably relied" on the

misrepresentations "in continuing to work with Mediatech."  (Am. Compl. ¶ 1.)

BioE also argues that, because of the false certifications, it had to ask customers

to return unused products from two lots previously certified by Mediatech. (Am. Compl. ¶ 5.) These allegations of reliance do not apply to pre-contract misrepresentations, but rather are limited to misrepresentations made after the contract was signed and the contamination was discovered. There could be no reliance in continuing the relationship if the representation was made before the contract was signed. Also, if representations regarding quality control were made before the specifications were actually agreed to, then the statements would appear to be vague puffery. Therefore, the Court dismisses the claims listed in the "Unknown Timing" section for failure to plead fraud with particularity.

### ii.    Pre-Contract Representations

BioE alleges that three misrepresentations by Mediatech and DeOlden occurred before the companies entered a contract:

- "During initial telephone conversations, as well as in e-mail correspondence in October 2004, Thompson represented that Mediatech was capable of producing an injectable-grade product that would meet BioE's specifications. These statements turned out to be false . . . ." (Am. Compl. ¶ 17.)

- "[I]n November 2004, before Mediatech and BioE had entered into the Agreement, Thompson had represented in a conference call that the automated fill machinery does not cause heating. That

statement, which BioE had relied upon, now turned out to be false." (Id. ¶ 32.)

- "In early 2005, [during a meeting at Mediatech's facility in Virginia], DeOlden claimed that Mediatech was expert in producing injectable grade products, and that Mediatech had the manufacturing capability and trained staff who would be able to produce the [Product]. . . . BioE later determined that DeOlden's and Mediatech's statements regarding Mediatech's expertise and capabilities were false." (Id. ¶¶ 18-19.)

BioE adequately identifies the time, place, content, and speaker for each of these representations. However, it does not specifically identify what was given up or obtained as a result of the alleged misrepresentations. BioE argues that its allegation of reliance is found in the first paragraph of the Amended Complaint. However, as the Court has explained, this paragraph it is not directed at these pre-contract statements. And even if that allegation of reliance did refer to these three statements, it still does not identify what was given up or obtained. BioE does not allege that it entered the relationship with Mediatech in reliance on alleged misrepresentations, only that the misrepresentations caused it to forego ending the relationship after contamination was already discovered and that, once the problem occurred, the misrepresentations caused delay.

Additionally, the first and third allegations are pre-contract puffery because they were made before BioE had set its specifications. Both statements are opinions of Mediatech's capabilities relative to as-yet-unknown standards. BioE fails to state how they were false statements at the time they were made – only alleging that the statements later turned out to be false. Thompson's statement that Mediatech's machinery did not cause heating is a statement of present fact, but it is unclear how BioE relied upon that statement.

### iii. Representations Made after Contract Execution

BioE also alleges three misrepresentations made at specific times after it entered the contract with Mediatech:

- "DeOlden contended on multiple occasions, including during conversations in July 2006, that [changes to Mediatech's processes] solved the problem. BioE relied on these statements. DeOlden's statements in July 2006 that the . . . problem was solved . . . were false." (Am. Compl. ¶¶ 33–35.)

- "DeOlden and other Mediatech representatives (Chris Cornell and Brian Posey) maintained that the particles did not result from Mediatech's processes. In March 2009, DeOlden drafted and sent to ASI and BioE a written report stating that the contamination could not be attributed to Mediatech. Specifically, DeOlden's report stated that 'the fibers found in the bags have not come from the Mediatech process.' In addition, during several telephone conversations, DeOlden claimed that they had taken apart

25

Mediatech's equipment and inspected it thoroughly, and stated that they were certain that Mediatech was not the source of contamination. . . . [T]hese statements were false and were made recklessly. Their falsity caused even further delay." (Am. Compl. ¶ 52.)

- "Despite [visual inspections by ASI and BioE showing that Mediatech's inspection was inadequate], Mediatech and DeOlden continued to assert falsely that the particle problems were resolved." (Am. Compl. ¶ 59.)

Each of these allegations identifies DeOlden as the person making the representation and the content of the representation. However, other flaws appear in the allegations.

The first allegation purports to identify July 2006 as the time at which the representation was made. However, the Amended Complaint indicates that the process changes DeOlden claimed had solved the denatured protein problem could not have been instituted until at least a month after he allegedly made the claim: BioE began clinical testing in August 2006. During clinical testing, Mediatech produced product with white particles. Mediatech "soon" determined that the white particles were denatured protein, after which it attempted to fix the problem by changing its processes. Thus, either the alleged

time of DeOlden's representation is incorrect or the content of the misrepresentation is not as claimed.

The second allegation does plead with particularity the time, place, contents, and identity of the person making the alleged misrepresentation. BioE claims DeOlden's statements were "made recklessly," which is an adequate allegation of scienter. However, BioE does not allege that it relied on the report, nor does it specify what was given up or obtained as a result of the alleged misrepresentation in the report.

As to the third allegation, BioE, by its own admission, did not rely upon Defendants' assertions that the particle problems were resolved, since BioE alleges that, while Defendant were making these statements, BioE was conducting its own visual inspections and was rejecting 5-15% of all Product delivered by BioE. Nor does BioE identify what was obtained or given up as a result of the misrepresentations: the alleged misrepresentation occurred after BioE had instituted its own quality control inspections.

In conclusion, the Court dismisses Count III without prejudice as to both Defendants. Overall, it is unclear which particular statements form the basis for

BioE's misrepresentation claim, when those statements were made, and how

BioE relied on and was damaged by those statements. The dismissal of Count

III is without prejudice in order to provide Plaintiff one more chance to clarify

its allegations.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

Defendants' Amended Motion to Dismiss [Docket No. 16] is
**GRANTED IN PART** and **DENIED IN PART** as follows:

1.    Defendants' motion to dismiss Defendant James DeOlden for
lack of personal jurisdiction is **DENIED**.

2.    Count III: Misrepresentation against Mediatech and DeOlden
is **DISMISSED WITHOUT PREJUDICE** for failure to plead
fraud with particularity.

3.    Count IV: Negligent Retention and Supervision is
**DISMISSED WITH PREJUDICE** for failure to state a claim.


Dated:  January 14, 2011                    s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court